**FILED**

**MAR 31 2020**

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STEPHEN CHRISTOPHER WRIGHT, ) | |
| Plaintiff, ) | CIV-20-287-JD |
| ) | |
| v. ) | Case No. |
| ) | |
| The State of Oklahoma ) | |
| ) | |
| Defendant. ) | |

**Plaintiff's Complaint, Plaintiffs Memorandum in Support of Law, Plaintiffs Motion for Temporary Restraining Order**

Comes now the Plaintiff, Stephen Wright, seeking relief from damages that occurred when his Constitutional rights were violated by the state of Oklahoma, and seeking a temporary restraining order.

### Introduction

The state of Oklahoma currently, pursuant to 2006 Oklahoma Code - Title 26. — Elections §26511: Petitions and filing fees, allows 2 methods in which to appear on the ballot. One method is to pay a filing fee, and another method is to physically gain signatures from voters within that district.

The Corona pandemic has caused many states to declare a state of emergency. During this pandemic, it is advised by health officials to include the Center for Disease Control to keep distance from one another. This creates a barrier to gathering physical signatures as it is against the advice of federal health officials to come into contact with one another at that distance.

The Corona pandemic has caused many states to declare a state of emergency. During this pandemic, unemployment has skyrocketed to over 3 million, the largest increase in unemployment rates in American history. Many people have been laid off or unable to return to work due to the State of Oklahoma's executive orders, causing an unprecedented financial burden on the entire population of the state of Oklahoma. This creates a financial barrier to obtaining the funds needed to appear on the ballot and also gathering the signatures needed to appear on the ballot. Therefore the State of

Oklahoma is creating multiple, unprecedented, barriers to running for office to include executive orders, Oklahoma statute Title 26 §26511.

The Plaintiff, and others running for public office in Oklahoma, do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualification. The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees. This includes financial descrimination.

The Defendant has made it so the only people able to get on the ballot are those with their own financial resources.

The Plaintiff has been found to have financial barriers, through approval of paupers applications, in CIV-19-1071-JD and CIV-20-201-JD in US District Court Oklahoma Western District

The Plaintiff has been found to have financial barriers in FD-2014-51 in Oklahoma County District Court, and is considered indigent.

## JURISDICTION AND VENUE

1. Plaintiffs' claims arise under the Constitution and laws of the United States. This Court has jurisdiction over these claims under 28 U.S.C. §§ 1331, 1343(a)(3).
12. This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. § 2201-2202 and Fed. R. Civ. P. 57 and 65. The federal rights asserted by Plaintiffs are enforceable under 42 U.S.C. § 1983.

2. Venue is proper in the Western District of Oklahoma under 28 U.S.C. § 1391(e). Defendant resides in this judicial district. All of the events and omissions by Defendants giving rise to this action occurred in this judicial district.

### Parties

3. The Plaintiff is Stephen Wright, a resident of Oklahoma County in the state of Oklahoma
4. The Defendant is the State of Oklahoma

## Count 1
## The Defendant is violating the Plaintiffs Federal Constitutional rights under the 14th amendment.

5. The Defendant is violating the Equal Protection Clause, a part of the 14th amendment to the United States Constitution, through actions deriving from both enforcement of executive orders and Oklahoma Statutes. This clause was the basis for Brown v. Board of Education (1954), the Supreme Court decision that helped to dismantle racial segregation, and also the basis for many other decisions rejecting discrimination against, and bigotry towards people belonging to various groups. The Plaintiff is a part of a group of people identified as Indigent. This group is recognized by the United States and the State of Oklahoma as a group, or class of people, which have financial barriers and therefore there has been action taken to make justice and law more equal to this group of people. An example of this is waiving the fees or security deposit for members of this group in cases like these. Therefore the precedent is aiding people of this group in obtaining and protecting rights, which include the right to be considered for public service without the burden of invidiously discriminatory disqualification the right to not unfairly or unnecessarily be burdened.

### Memorandum of law in Support

The Equal Protection Clause applies to state specification of qualifications for elective and appointive office. Although one may "have no right" to be elected or appointed to an office, all persons "do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualification. The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees."1989 In Bullock v. Carter,1990 the Court used a somewhat modified form of the strict test in passing upon a filing fee system for primary election candidates that imposed the cost of the election wholly on the candidates and that made no alternative provision for candidates unable to pay the fees; the reason for application of the standard, however, was that the fee system deprived some classes of voters of the opportunity to vote for certain candidates and it worked its classifications along lines of wealth. The system itself was voided because it was not reasonably connected with the state's interest in regulating the ballot and did not serve that interest and because the cost of the election could be met out of the state treasury, thus avoiding the discrimination.1991

Recognizing the state interest in maintaining a ballot of reasonable length in order to promote rational voter choice, the Court observed nonetheless that filing fees alone do not test the genuineness of a candidacy or the extent of voter support for an aspirant. Therefore,

effectuation of the legitimate state interest must be achieved by means that do not unfairly or unnecessarily burden the party's or the candidate's "important interest in the continued availability of political opportunity. The interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both and it is this broad interest that must be weighed in the balance. . . . [T]he process of qualifying candidates for a place on the ballot may not constitutionally be measured solely in dollars."1992 In the absence of reasonable alternative means of ballot access, the Court held, a state may not disqualify an indigent candidate unable to pay filing fees.1993

In Clements v. Fashing,1994 the Court sustained two provisions of state law, one that barred certain officeholders from seeking election to the legislature during the term of office for which they had been elected or appointed, but that did not reach other officeholders whose terms of office expired with the legislators' terms and did not bar legislators from seeking other offices during their terms, and the other that automatically terminated the terms of certain officeholders who announced for election to other offices, but that did not apply to other officeholders who could run for another office while continuing to serve. The Court was splintered in such a way, however, that it is not possible to derive a principle from the decision applicable to other fact situations.

In Williams v. Rhodes,1995 a complex statutory structure that had the effect of keeping off the ballot all but the candidates of the two major parties was struck down under the strict test because it deprived the voters of the opportunity of voting for independent and third-party candidates and because it seriously impeded the exercise of the right to associate for political purposes. Similarly, a requirement that an independent candidate for office in order to obtain a ballot position must obtain 25,000 signatures, including 200 signatures from each of at least 50 of the state's 102 counties, was held to discriminate against the political rights of the inhabitants of the most populous counties, when it was shown that 93.4% of the registered voters lived in the 49 most populous counties.1996 But to provide that the candidates of any political organization obtaining 20% or more of the vote in the last gubernatorial or presidential election may obtain a ballot position simply by winning the party's primary election, while requiring candidates of other parties or independent candidates to obtain the signatures of less than five percent of those eligible to vote at the last election for the office sought, is not to discriminate unlawfully, because the state placed no barriers of any sort in the way of obtaining signatures and because write-in votes were also freely permitted.1997

Reviewing under the strict test the requirements for qualification of new parties and independent candidates for ballot positions, the Court recognized as valid objectives and compelling interests the protection of the integrity of the nominating and electing process, the promotion of party stability, and the assurance of a modicum of order in regulating the size of the ballot by requiring a showing of some degree of support for independents and new parties before they can get on the ballot.1998 "[T]o comply with the First and Fourteenth Amendments the State must provide a feasible opportunity for new political organizations and their candidates to appear on the ballot."1999 Decision whether or not a state statutory structure affords a

feasible opportunity is a matter of degree, "very much a matter of 'consider[ing] the facts and circumstances behind the law, the interest which the State claims to be protecting, and the interest of those who are disadvantaged by the classification.' "2000

Thus, in order to assure that parties seeking ballot space command a significant, measurable quantum of community support, Texas was upheld in treating different parties in ways rationally constructed to achieve this objective. Candidates of parties whose gubernatorial choice polled more than 200,000 votes in the last general election had to be nominated by primary elections and went on the ballot automatically, because the prior vote adequately demonstrated support. Candidates whose parties polled less than 200,000 but more than 2 percent could be nominated in primary elections or in conventions. Candidates of parties not coming within either of the first two categories had to be nominated in conventions and could obtain ballot space only if the notarized list of participants at the conventions totaled at least one percent of the total votes cast for governor in the last preceding general election or, failing this, if in the 55 succeeding days a requisite number of qualified voters signed petitions to bring the total up to one percent of the gubernatorial vote. "[W]hat is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot," but the Court thought that one percent, or 22,000 signatures in 1972, "falls within the outer boundaries of support the State may require."2001 Similarly, independent candidates can be required to obtain a certain number of signatures as a condition to obtain ballot space.2002 A state may validly require that each voter participate only once in each year's nominating process and it may therefore disqualify any person who votes in a primary election from signing nominating or supporting petitions for independent parties or candidates.2003 Equally valid is a state requirement that a candidate for elective office, as an independent or in a regular party, must not have been affiliated with a political party, or with one other than the one of which he seeks its nomination, within one year prior to the primary election at which nominations for the general election are made.2004 So too, a state may limit access to the general election ballot to candidates who received at least 1% of the primary votes cast for the particular office.2005 But it is impermissible to print the names of the candidates of the two major parties only on the absentee ballots, leaving off independents and other parties.2006 Also invalidated was a requirement that independent candidates for President and Vice-President file nominating petitions by March 20 in order to qualify for the November ballot.2007

Footnotes

1989
Turner v. Fouche, 396 U.S. 346, 362–63 (1970) (voiding a property qualification for appointment to local school board). See also Chappelle v. Greater Baton Rouge Airport Dist., 431 U.S. 159 (1977) (voiding a qualification for appointment as airport commissioner of ownership of real or personal property that is assessed for taxes in the jurisdiction in which airport is located); Quinn v. Millsap, 491 U.S. 95 (1989) (voiding property ownership requirement for appointment to board authorized to propose reorganization of local government). Cf. Snowden v. Hughes, 321 U.S. 1 (1944).

1990 405 U.S. 134, 142–44 (1972).
1991 405 U.S. at 144–49.
1992 Lubin v. Panish, 415 U.S. 709, 716 (1974).
1993 Concurring, Justices Blackmun and Rehnquist suggested that a reasonable alternative would be to permit indigents to seek write-in votes without paying a filing fee, 415 U.S. at 722, but the Court indicated this would be inadequate. Id. at 719 n.5.
1994 457 U.S. 957 (1982). A plurality of four contended that save in two circumstances—ballot access classifications based on wealth and ballot access classifications imposing burdens on new or small political parties or independent candidates— limitations on candidate access to the ballot merit only traditional rational basis scrutiny, because candidacy is not a fundamental right. The plurality found both classifications met the standard. Id. at 962–73 (Justices Rehnquist, Powell, O'Connor, and Chief Justice Burger). Justice Stevens concurred, rejecting the plurality's standard, but finding that inasmuch as the disparate treatment was based solely on the state's classification of the different offices involved, and not on the characteristics of the persons who occupy them or seek them, the action did not violate the Equal Protection Clause. Id. at 973. The dissent primarily focused on the First Amendment but asserted that the classifications failed even a rational basis test. Id. at 976 (Justices Brennan, White, Marshall, and Blackmun).
1995 393 U.S. 23 (1968). "[T]he totality of the Ohio restrictive laws taken as a whole imposes a burden on voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause." Id. at 34. Justices Douglas and Harlan would have relied solely on the First Amendment, id. at 35, 41, and Justices Stewart and White and Chief Justice Warren dissented. Id. at 48, 61, 63.
1996 Moore v. Ogilvie, 394 U.S. 814 (1969) (overruling MacDougall v. Green, 335 U.S. 281 (1948)).
1997 Jenness v. Fortson, 403 U.S. 431 (1971).
1998 Storer v. Brown, 415 U.S. 724 (1974); American Party of Texas v. White, 415 U.S. 767 (1974); Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173 (1979). See also Indiana Communist Party v. Whitcomb, 414 U.S. 441 (1974) (impermissible to condition ballot access upon a political party's willingness to subscribe to oath that party "does not advocate the overthrow of local, state or national government by force or violence," opinion of Court based on First Amendment, four Justices concurring on equal protection grounds).
1999 Storer v. Brown, 415 U.S. 724, 746 (1974).
2000 415 U.S. at 730 (quoting Williams v. Rhodes, 393 U.S. 23, 30 (1968)).
2001 American Party of Texas v. White, 415 U.S. 767, 783 (1974). In Storer v. Brown, 415 U.S. 724, 738–40 (1974), the Court remanded so that the district court could determine whether the burden imposed on an independent party was too severe, it being required in 24 days in 1972 to gather 325,000 signatures from a pool of qualified voters who had not voted in that year's partisan primary elections. See also Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173 (1979) (voiding provision that required a larger number of signatures to get on ballot in subdivisions than statewide).
2002 American Party of Texas v. White, 415 U.S. 767, 788–91 (1974). The percentages varied with the office but no more than 500 signatures were needed in any event.
2003 415 U.S. at 785–87.

2004 Storer v. Brown, 415 U.S. 724, 728–37 (1974). Dissenting, Justices Brennan, Douglas and Marshall thought the state interest could be adequately served by a shorter time period than a year before the primary election, which meant in effect 17 months before the general election. Id. at 755.
2005 Munro v. Socialist Workers Party, 479 U.S. 189 (1986).
2006 American Party of Texas v. White, 415 U.S. 767, 794–95 (1974). Upheld, however, was state financing of the primary election expenses that excluded convention expenses of the small parties. Id. at 791–94. But the major parties had to hold conventions simultaneously with the primary elections the cost of which they had to bear. For consideration of similar contentions in the context of federal financing of presidential elections, see Buckley v. Valeo, 424 U.S. 1, 93–97 (1976).
2007 Anderson v. Celebrezze, 460 U.S. 780 (1983). State interests in assuring voter education, treating all candidates equally (candidates participating in a party primary also had to declare candidacy in March), and preserving political stability, were deemed insufficient to justify the substantial impediment to independent candidates and their supporters.

**Relief**

The Plaintiff requests relief from Economic Damages equaling the salary, for the full duration of office, in the position of US House of Representatives. The amount of economic damages requested is $348,000

The Plaintiff is seeking a permanent injunction against Oklahoma State statute 2006 Oklahoma Code - Title 26. — Elections §26511

## Plaintiffs Motion for Temporary Restraining Order

1. Comes now the Plaintiff seeking Temporary Restraining Orders prohibiting the State of Oklahoma from enforcing unconditionally biased statues to include 2006 Oklahoma Code - Title 26. Elections §26511: Petitions and filing fees. The Corona Epidemic has made appearing on the ballot impossible unless you are one class, or group, of people which is a class that has no financial barriers.

## Brief in Support

2. The Temporary Restraining Order should be approved because serious and irreparable harm will come to the Plaintiff to include not being able to appear on the ballot for Congressional District 3, it is likely the Plaintiff will be successful in this complaint based on merits, and it is in the best interest of the public to be fair and apply justice everyone equally, and it is in the best interest of the public to not come into contact with one another to gain signatures for compliance with 2006 Oklahoma Code - Title 26. Elections §26511 during a contagious virus outbreak and pandemic, and because the Center for Disease Control (A federal agency) advises against the actions which the Oklahoma statute requires to gain access to the ballot. It is a danger to public health to not grant this Temporary Restraining Order.

## Relief

3. The Plaintiff requests this court create an order that Prohibits the State of Oklahoma from requiring any money or signatures from a candidate for public office
4. The Plaintiff requests this court create an order that orders the State of Oklahoma to "Place any and all individuals on the ballot without any requirement of signature or money"

_[signature]_
Stephen Wright
1108 N Bradley Ave
OKC, OK, 73127

phone: 360.999.2736